UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHAD SLEIMAN,

          Plaintiff,

    v.                                                              25-CV-93-LJV
                                                                  DECISION & ORDER
HON. JOSEPH C. LORIGO,

          Defendant.

_____


On January 29, 2025, the pro se plaintiff, Chad Sleiman, filed a complaint under

42 U.S.C. §§ 1983 and 1985 against Joseph C. Lorigo, a Justice of the New York State

Supreme Court, Erie County.[1]  Docket Item 1.  Sleiman alleges that Justice Lorigo

engaged in "judicial collusion" and violated Sleiman's constitutional rights while

presiding over Sleiman's divorce proceedings.  *See id.* at ¶¶ 38-49.

On February 7, 2025, Lorigo moved to dismiss the complaint.  Docket Item 5.

About a month later, Sleiman responded, Docket Item 9, and five days after that, Lorigo

replied, Docket Item 11.

Lorigo's motion to dismiss is granted.  Even if everything Sleiman says is true

and he has good reason to be unhappy about the way he was treated in his divorce

proceedings, he cannot get damages from the judge who presided over those

_____

[1] Sleiman does not explicitly invoke these statutes, but the Court construes the
complaint as asserting claims under them because Sleiman has sued a state official—a
justice of the New York State Supreme Court—for conspiring to violate, and violating,
his constitutional rights.  *See* Docket Item 1.

proceedings.  Judicial immunity precludes such relief.  And as explained below, that is true regardless of bias, or motive, or even malice.

## BACKGROUND[2]

In 2018,[3] Sleiman and his wife[4] separated and entered "a [p]roperty [s]ettlement and [s]eparation [a]greement" that set out the terms on which they would "separate their marital lives."  *See* Docket Item 1 at ¶ 9.  "The parties lived by the [agreement's terms] for two years."  *Id.*  On July 30, 2020, Sleiman filed for divorce based on the terms of that agreement.[5]  *See id.*

Ten months later, Sleiman's wife claimed that Sleiman had "abuse[d]" her.  *Id.* at ¶ 10.  In support of that claim, her counsel "intentionally altered" an official form to state that both Sleiman and his wife were "Middle Eastern."  *Id.* at ¶¶ 10-11.  Sleiman says that was done to suggest that he was "terroristic" and "oppressive toward women."  *Id.*

---

[2] The following facts are taken from the complaint, Docket Item 1.  On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  Moreover, because Sleiman is proceeding pro se, this Court "construe[s] his] complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

[3] Although this year is not explicitly stated in the complaint, the Court infers it based on the timeline outlined in paragraph 9.

[4] Sleiman consistently refers to his "wife" rather than his "ex-wife" in the complaint, and so this Court does the same; indeed, his allegations suggest that the divorce has not yet been finalized.  *See* Docket Item 1.

[5] Sleiman does not say where he commenced the divorce action, but this Court assumes that it was in New York State Supreme Court, Erie County, because Justice Lorigo eventually was assigned to it.  *See* Docket Item 1 at ¶¶ 9, 14.

at ¶ 11.  In fact, he says, there was "no evidence of abuse" nor any evidence that his wife was "the subject of oppression and abuse in the marriage."  *Id.*

Sleiman's wife also challenged what Sleiman refers to as the separation agreement's "Muslim lineage provision," which provided that Sleiman would be "given custody of children of the marriage under 12 years of age if [Sleiman's wife] decide[d] to remarry."  *Id.* at ¶ 12.  He explains that "[t]he Muslim religion seeks to protect family lineage" and that the "Muslim lineage provision" was consistent with that "religious intent."  *Id.*  In the state proceedings, Sleiman submitted proof that when they were negotiating the terms of the separation agreement, "[his] wife . . . made changes to [the Muslim lineage] provision" that "temper[ed] its strictness."  *Id.*  Nevertheless, "the first court assigned to th[e] matrimonial" action "found the provision unconscionable," without even holding a hearing and "in spite of the evidence" that Sleiman offered.  *Id.* at ¶ 13.  Sleiman appealed.  *Id.*

On August 1, 2023, the matrimonial action was assigned to the defendant in this case, Justice Lorigo.  *Id.* at ¶ 14.  During the initial conference before Lorigo, at which Sleiman represented himself, counsel for Sleiman's wife claimed that the justice from whom the case was transferred had "ordered [Sleiman to pay] $20,000 in attorney's fees."  *Id.* at ¶16.  In fact, however, there was "no [such] order," and counsel's allegations about Sleiman's noncompliance with discovery were false.  *Id.* at ¶ 17.  Nevertheless, "[w]ithout review[ing] . . . the record or any evidence," Justice Lorigo "took judicial notice" of the "non-existent order" and ordered Sleiman to pay $20,000 to his wife's counsel.  *Id.* at ¶¶ 16-19 (emphasis omitted).

Justice Lorigo also denied several of Sleiman's motions, including one challenging the award of attorney's fees.  *See id.* at ¶¶ 14-15, 20-21.  The order deciding those motions—based on "false" information and contrary to the evidence that Sleiman had provided—among other things directed Sleiman to pay $27,500 to defense counsel by the end of 2023.  *See id.* at ¶ 21(D), (J).  The order also required Sleiman to seek permission before filing further pro se motions, seriously hampering Sleiman's ability to defend himself.  *Id.* at ¶¶ 21(K), 22.

At a status conference in late December 2023, Lorigo told Sleiman that the latter would "face . . . contempt charges" if he did not pay by the year-end deadline.  *See id.* at ¶ 25.  As a result, Sleiman was "forced . . . to use" the proceeds of a small-business loan "to pay [the attorney's fees]" in violation of the loan's terms.  *See id.* at ¶ 26.  All told, Lorigo's decisions ignored the way that opposing counsel was manipulating evidence and abusing the judicial process, and those decisions directly "affected" Sleiman's rights.  *See, e.g.*, *id.* at ¶ 23.

On December 22, 2023, the Appellate Division, Fourth Department, issued a decision on Sleiman's appeal of the decision regarding the unconscionability of the "Muslim lineage provision."[6]  *See id.* at ¶¶ 12-13, 24.  The appeals court "modified . . . the order and remitted it back to the trial court for hearings on unconscionability and severability."  *See id.* at ¶ 24.  But Lorigo has yet to hold those hearings, even as he has "continued to rule as if the [separation agreement] was determined unconscionable in its entirety."  *Id.*

---

[6] While Sleiman does not identify the appeals court, this Court assumes it was the Fourth Department because he was appealing an order of the New York State Supreme Court, Erie County.  *See supra* note 5.

As result of opposing counsel's conduct and Lorigo's rulings, Sleiman was forced to retain counsel, which further strained "his financial condition." *See id.* at ¶¶ 28-29. In fact, at every turn, Lorigo has favored counsel for Sleiman's wife at Sleiman's expense. *See id.* at ¶ 37. For example, Lorigo "scolded [Sleiman] harshly that communication via email was only for scheduling matters," while his wife's counsel "retained carte blanche access to [Lorigo's] email." *Id.* at ¶ 27. In September 2024, Lorigo ordered Sleiman to pay an additional $12,500 in legal fees to opposing counsel while ignoring the objections that Sleiman had filed pro se. *Id.* at ¶ 31. Later, Lorigo ordered the sale of Sleiman's marital home "without a hearing" and "in favor of the defense." *Id.* at ¶ 33. And by ruling in favor of Sleiman's wife on certain discovery issues, Lorigo has effectively given "defense counsel authority to interfere with [Sleiman's] pro se ability to defend himself." *Id.* at ¶ 34 (italics omitted).

Sleiman says that Lorigo's decisions to favor the attorney for Sleiman's wife are based on politics: Lorigo is a New York State Supreme Court Justice and defense counsel is "a local judge" in Lancaster, New York. *Id.* at ¶ 35. In fact, Lorigo "and defense counsel have political connections" in the local Republican party; they have previously "endorsed each other"; and they have "contributed to each other's campaigns for judicial office." *Id*. So Lorigo's bias, Sleiman says, has a nefarious, political motive.

In sum, Sleiman asserts that Lorigo has "endors[ed opposing] counsel's fraudulent tactics and unethical condemnation of [Sleiman's] Middle Eastern [r]eligion and heritage." *Id.* at ¶ 37. What is more, he says, Lorigo has "engaged in an arrangement of collusion" where the justice "secret[ly] collaborat[ed with Sleiman's

wife's counsel] to influence the legal decisions . . . at [Sleiman's] expense." *Id.* at ¶ 46. And Lorigo allegedly did all that because of political connections. *Id.* at 35.

Sleiman seeks damages for Lorigo's conduct that violated Sleiman's First, Fifth, and Fourteenth Amendment rights.[7]  *See id.* at ¶¶ 38-49.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## I.    JUDICIAL IMMUNITY

Lorigo says that Sleiman's claims are barred by judicial immunity.  *See* Docket Item 5-1 at 6-8.[8]  This Court agrees.

---

[7] Sleiman asserts two claims: one alleging violations of his constitutional rights and one alleging "judicial collusion."  *See id.* at ¶¶ 38-49.  The Court understands the claims as arising under section 1983 and 1985, respectively; Sleiman's judicial collusion claim is essentially a claim that Lorigo "conspire[d] for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice . . . with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2).

[8] Page numbers in docket citations refer to ECF pagination.

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions." *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). This is to ensure "that a judicial officer, in exercising the authority vested in [that judge], shall be free to act upon [the judge's] own convictions, without apprehension of personal consequences." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). Judicial immunity therefore does not give way even to "allegations of bad faith or malice." *Mireles v. Waco*, 502 U.S. 9, 11 (1991).

In fact, judicial "immunity is overcome in only two sets of circumstances." *Id.* "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." *Id.* (italics omitted). "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12.

## A.    Nonjudicial Capacity

Every claim in the complaint relates precisely to Lorigo's alleged conduct and decisions as a New York State Supreme Court Justice while presiding over Sleiman's divorce proceedings. *See* Docket Item 1. More specifically, Sleiman says that Justice Lorigo violated his constitutional rights by favoring opposing counsel, a political ally; by failing to hold hearings or even to consider Sleiman's evidence; and by generally conducting the proceedings to Sleiman's disadvantage. *See id.* And regardless of bias, ulterior motive, or even malice, those are precisely the sort of claims that judicial immunity precludes.

"The Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven*, 579 F.3d

at 210.  In particular, judges' decisions on motions are indisputably judicial actions.  *See Buhannic v. Friedman*, 2019 WL 481732, at *5 (S.D.N.Y. Feb. 7, 2019) (ruling on motions is a "quintessential judicial act[]").  And Sleiman's assertion that Justice Lorigo's conduct and decisions deprived him of his constitutional rights does not make that conduct and those decisions any less judicial—even if they were politically motivated or otherwise improper.  Docket Item 1 at ¶¶ 38-44; Docket Item 9 at 6; *see Coombs v. United States*, 2021 WL 2453496, at *2-3 (S.D.N.Y. June 15, 2021) (judge's issuance of orders excluding time under federal Speedy Trial Act during Covid-19 pandemic, which plaintiff said deprived him of his constitutional rights, were judicial acts protected by judicial immunity); *Parent v. New York*, 786 F. Supp. 2d 516, 533 (N.D.N.Y. 2011) (holding that even if judge in divorce proceedings "acted improperly or in error, or with malice or bad faith" in presiding over those proceedings, "his entitlement to judicial immunity remain[ed]"), *aff'd*, 485 F. App'x 500 (2d Cir. 2012) (summary order).

Sleiman's allegations that Lorigo also engaged in "judicial collusion," *see* Docket Item 1, do not change this analysis.  For one thing, those allegations are largely conclusory:  Sleiman says that Lorigo acted "in secret collaboration" with opposing counsel to violate his rights, but he does not provide any facts to support that claim other than Lorigo's rulings during the divorce proceedings.  *See id.* at ¶¶ 46-48.  And secretly collaborative or not, such conduct clearly is "judicial" and therefore protected. "[S]ince absolute immunity spares [judges] any scrutiny of [their] motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity."  *See Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987); *Patterson v.*

8

*Rodgers*, 708 F. Supp. 2d 225, 235 (D. Conn. 2010) ("[A]llegations of conspiracy do not defeat judicial immunity."); *see also Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 715 (S.D.N.Y. 2011) (holding that judge's "rulings[, even though] adverse to plaintiff, [we]re the very essence of judicial functions and [could ]not, therefore, be the basis for liability" (some internal quotation marks omitted) (quoting *Williams v. Jurow*, 2007 WL 5463418, at *10 (S.D.N.Y. June 29, 2007))).

### B.    Complete Absence of All Jurisdiction

The second exception to judicial immunity—acts in the complete absence of a judge's jurisdiction—also is not present here.  Indeed, Sleiman seeks damages in connection with Lorigo's decisions in a matrimonial action assigned to Lorigo as a New York State Supreme Court Justice.  *See* Docket Item 1.  And it is hard to imagine a case any more clearly within a judge's jurisdiction.

As the Supreme Court has explained, there is a difference between a judge who acts in "excess of jurisdiction" and one who acts in "the clear absence of all jurisdiction over the subject[ ]matter."  *Stump v. Sparkman*, 435 U.S. 349, 356-57, 356 n.6 (1978) (quoting *Bradley*, 435 U.S. at 351-52).  Only in the second situation is the judge "deprived of [judicial] immunity."  *Id.* at 356-57.  In *Stump*, the Court provided an example to illustrate the point:

> [I]f a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune.

*Id.* at 357 n.7 (citing *Bradley*, 435 U.S. at 352).

Sleiman has alleged no facts suggesting that Lorigo acted "in the complete absence of all jurisdiction." *See Mireles*, 502 U.S. at 12. On the contrary, he says that Lorigo violated his rights during divorce proceedings to which Lorigo was assigned and over which Lorigo presided. *See* Docket Item 1. And the New York State Supreme Court—a court of "general jurisdiction"—certainly has jurisdiction over such cases. *See Muka v. Murphy*, 358 F. App'x 239, 240 (2d Cir. 2009) (summary order); *Chris H. v. New York*, 764 F. App'x 53, 54 (2d Cir. 2019) (summary order) (holding that judge "acted in her judicial capacity as a justice of the New York State Supreme Court when she presided over [a] matrimonial case, issued an order of protection . . . , and made decisions regarding the marital home," noting that court "had jurisdiction over [such] proceedings"). So Lorigo did not act in the complete absence of jurisdiction, the second exception is likewise inapplicable here, and judicial immunity applies with full force.

## II.    LEAVE TO AMEND

Generally, a court "should not dismiss" a pro se complaint—or any of its claims—"without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)). But because Sleiman's claims by their very nature are barred by judicial immunity, "better pleading will not cure" that defect. *Id.* at 112. Sleiman's claims therefore are dismissed without leave to amend.

## **CONCLUSION**

For the reasons stated above, Justice Lorigo's motion to dismiss, Docket Item 5, is GRANTED. The Clerk of the Court shall close this case.

SO ORDERED.

Dated:   June 20, 2025
         Buffalo, New York


            /s/ Lawrence J. Vilardo
           LAWRENCE J. VILARDO
           UNITED STATES DISTRICT JUDGE